# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KRISTIN SANDERS
                    **Plaintiff,**

    **v.**                                                              **Case No. 25-C-1143**

**FRANK BISIGNANO,**
**Commissioner of the Social Security Administration**
                    **Defendant.**

## DECISION AND ORDER

Plaintiff Kristin Sanders seeks judicial review of the denial of her application for social security disability benefits. She alleges that the Administrative Law Judge (ALJ) assigned the case erred in evaluating the opinion of her treating physician, her ability to use her arms and hands, and her statements about her symptoms and limitations. I largely agree and thus remand the matter for further proceedings.

## I. FACTS AND BACKGROUND

**A.    Summary of Medical Evidence**

Plaintiff alleged a disability onset date of July 20, 2020, and she remained "insured" for purposes of receiving benefits through December 31, 2022, meaning she need to establish disability between these dates. The record in this case is voluminous, exceeding 4200 pages, including medical evidence from before and after the relevant period.

The treatment notes document a history of back and neck pain, for which plaintiff received chiropractic treatment, leading up to the alleged onset of disability in July 2020. (E.g.,

Tr. at 1367, 1453.)[1] On July 20, 2020, plaintiff fell down some stairs, causing bruising on her buttocks and increased pain. (Tr. at 647-48.) On exam, her primary physician, Dr. Martin Baur, noted good active range of motion (ROM) of both arms, with some discomfort on the right. She demonstrated 5/5 strength in the bilateral upper extremities, with normal sensation. She displayed mild discomfort with standing from a seated position, but a normal gait. Dr. Baur recommended an MRI and a course of physical therapy (PT). (Tr. at 649.)

July 2020 PT notes documented neck pain and radiating lower back pain, a slow/cautious gait, and limited ROM. (Tr. at 641-43.) The August 2020 lumbar MRI revealed mild/minimal findings. (Tr. at 1200, 1203.) An ultrasound of the right buttock confirmed the presence of a hematoma from the fall. (Tr. at 622, 1197.) A September 4, 2020, PT note stated: "Driving to Arkansas later this date and will be doing most of the driving." (Tr. at 609.) "She is traveling out of town for the next week, driving to Arkansas and back so focus of today's session was tolerance to required activities including driving, posture and positioning to avoid increase in discomfort and management of symptoms." (Tr. at 610.) A September 16, 2020, note reported that she went to Arkansas the previous week. She also reported some reduction in symptoms since starting PT. (Tr. at 599.)

A September 2020 nerve conduction study/EMG revealed mild acute right C6-7 cervical radiculopathy. (Tr. at 1185, 1178.) Dr. Baur recommended a neuro-surgical consult (Tr. at 586), and in November 2020 plaintiff saw Dr. Kyle Swanson regarding her neck and right arm pain (Tr. at 572). On exam, she displayed normal neck ROM, but tenderness on the right side. (Tr. at 575.) Testing showed reduced grip strength in both hands. (Tr. at 576.) Dr. Swanson

---

[1]In this summary, I focus on those impairments significant to plaintiff's disability claim, omitting discussion of other health issues.

2

recommended conservative measures, making a referral to PT. (Tr. at 577.) Later that month, Dr. Baur also referred plaintiff to the Aurora back and spine program. (Tr. at 570.)

Plaintiff commenced PT for her neck in December 2020 (Tr. at 561), noting a long history of neck pain, worse after the fall in July (Tr. at 562). On exam, she displayed some reduced strength and painful ROM. (Tr. at 563.)

Later in December 2020, plaintiff saw a physician at Aurora, who recommended she continue in PT, receive trigger point injections, and start the medications gabapentin and tizanadine. (Tr. at 558.) Plaintiff also returned to Dr. Swanson that month, and he recommended continued conservative treatment. (Tr. at 554.) Plaintiff received an injection in late December 2020, noting 80% improvement of thoracic pain. (Tr. at 530.) December 2020 to January 2021 PT notes generally documented overall improvement in symptoms. (Tr. at 543, 540, 537, 535.) A January 2021 thoracic spine MRI showed minimal degenerative disc disease, without spinal canal or foraminal narrowing. (Tr. at 1165.) In February 2021, plaintiff received another injection.[2] (Tr. at 518.) During subsequent PT visits, plaintiff noted less neck pain after the injection but with continued symptoms in the right arm. (Tr. at 515-16, 510.) She discharged from PT in March 2021, noting significant reduction in left shoulder symptoms but with continued right arm numbness. (Tr. at 505.) She also reported minimal improvement of her neck pain after the injection in February 2021, and that the neck pain limited her activities. (Tr. at 500.) Aurora providers scheduled another cervical injection and recommended she continue gabapentin and tizanidine as prescribed by Dr. Swanson. (Tr. at 502, 476.)

In June 2021, plaintiff reported a return of low back and thoracic pain. (Tr. at 462.) On

---

[2]She also continued to seek treatment for the buttock hematoma. (Tr. at 524.)

3

exam, she displayed normal gait and 5/5 strength. (Tr. at 463.) Providers recommended further injections and continued use of gabapentin and tizanadine. (Tr. at 465, 448-49.)

In July 2021, plaintiff complained of right hip pain, and an arthrogram showed a separation-type tear along the superior labrum. (Tr. at 1127.) Plaintiff reported drinking 14 shots per week to help control pain. (Tr. at 413.) She ambulated with a mild limp, but with normal coordination of the upper and lower extremities. (Tr. at 415.) Providers recommended PT and a cortisone injection in the right hip. (Tr. at 416.)

In August 2021, plaintiff advised her Aurora providers of 85% pain relief from the previous injection, but the symptoms had recently returned. She was scheduled for further injections. (Tr. at 412.)

In September 2021, plaintiff started PT for her right hip (Tr. at 403), noting her activities were limited due to pain (Tr. at 404).[3] She also received a right hip injection. (Tr. at 402, 1120.) Later that month, plaintiff saw Dr. Walter Jacobsen for a neuro-surgical consult, reporting low back and right leg pain, with little relief from injections and PT. (Tr. at 390-91.) Exam revealed a stable gait and 5/5 strength throughout. Dr. Jacobsen recommended additional injections and ordered further imaging. (Tr. at 395.) Lumbar x-rays showed moderate spondylosis at L4-5 (Tr. at 1116), and cervical x-rays showed mild disc degeneration (Tr. at 1117). Plaintiff also continued in PT, noting continued back and shooting leg pain. (Tr. at 388, 384, 374, 372.)

In October 2021, plaintiff saw Dr. Anthony Ricci for surgical consult regarding her right hip. (Tr. at 347.) On exam, she displayed normal sensation, no instability, tenderness with gentle palpation, and pain with rotation. (Tr. at 349.) Dr. Ricci found she was not a candidate

---

[3]She also again sought treatment for the buttock hematoma. (Tr. at 382-83.)

for hip surgery due to her BMI,[4] recommending pain management. (Tr. at 350.)

A November 2021 cervical MRI showed mild degenerative changes and mild spinal canal stenosis. (Tr. at 1663, 1844.) Later that month plaintiff saw Dr. Peter Gikas, on referral from Dr. Jacobsen, for additional injections. (Tr. at 1793, 1772.) On exam, her gait was largely non-antalgic without an assistive device. (Tr. at 1778.) She also received chiropractic care during this time, with notes indicating she "continues to struggle with pain, discomfort and limitations while at work and performing activities of daily living." (Tr. at 1543, 1547, 1550, 1560, 1564, 1567, 1569, 1572.) In December 2021, Dr. Gikas provided injections (Tr. at 1757), with plaintiff noting some relief on the right side but with continued pain in the buttocks and down the leg, and no relief at all on left side (Tr. at 1748, 1746, 1729). Plaintiff also saw Dr. Swanson that month, and he ordered an EMG. (Tr. at 1755.) During a followup with Dr. Gikas, plaintiff displayed antalgic gait without loss of balance. (Tr. at 1739.) The electrodiagnostic studies showed mild S1 radiculopathy (Tr. at 1726), but the upper extremity testing was normal, with no evidence for nerve entrapment, neuropathy, plexopathy or radiculopathy (Tr. at 1719).

During a January 2022 followup with Dr. Swanson, plaintiff reported continued pain, 10/10 with activities, 8/10 at rest, unable to walk more than 10 feet before needing to stop. (Tr. at 1709.) However, her gait was normal. (Tr. at 1713.) Dr. Swanson recommended another lumbar MRI. (Tr. at 1715.) Plaintiff also continued in PT, reporting things were not going well. (Tr. at 1705, 1703, 1700.) During a February 2022 followup with Dr. Gikas, she displayed antalgic gait without loss of balance. (Tr at 1696.) The February 2022 lumbar MRI revealed L4/5 disc extrusion, with moderate to marked spinal canal narrowing. (Tr. at 1662, 1831.)

---

[4]At that time, plaintiff stood 5'4" tall and weighed 259 pounds, producing a BMI (body mass index) of 44.5. (Tr. at 349.)

Based on the progression shown on the MRI, Dr. Swanson recommended surgery. (Tr. at 1688.) Plaintiff also continued in PT, with providers noting use of a cane to allow decreased weight-bearing (Tr. at 1670), reporting terrible pain (Tr. at 1655). She discharged from PT in March 2022 due to her upcoming surgery. (Tr. at 1637.)

In April 2022, Dr. Swanson performed an L4/5 microdiskectomy. (Tr. at 1616.) During followup visits with Dr. Swanson, plaintiff reported improved leg pain, using a cane for ambulation. (Tr. at 1605.) Dr. Swanson initially imposed a weight lifting restriction of 10 pounds. (Tr. at 1609.) In May 2022, Dr. Swanson increased the weight restriction to 20 pounds and referred her for PT. (Tr. at 1595.) During her initial therapy evaluation, plaintiff reported her symptoms had been about 90% improved down her leg, but now only 80%. Her low back pain was 50% improved. She used a case when walking prolonged distances. (Tr. at 1588, 1860.) During subsequent PT sessions, plaintiff reported some improvement but with continued pain, especially with prolonged activity. (Tr. at 1586, 2158, 2155.) During a June 2022 followup with Dr. Swanson, plaintiff reported the left leg pain was almost completely gone; she did complain of intermittent low back pain. (Tr. at 2148.) In July 2022, plaintiff told her physical therapist she was now using stairs instead of the elevator. (Tr. at 2142.) She also reported improved low back pain, able to grocery shop easier, but limited to lifting light groceries (Tr. at 2132.) Plaintiff discharged from PT in August 2022 (Tr. at 2112), noting improved left leg pain, ambulating without an assistive device, and using stairs instead of the elevator (Tr. at 2113). She continued to have some back pain, which the therapist believed should improve as core strength increased. (Tr. at 2114.) During an annual exam with Dr. Baur that month she displayed a normal gait. (Tr. at 4007, 4011.)

In September 2022, due to continued issues with the buttock lipoma, plaintiff decided

6

to proceed with an excision. (Tr. at 2453.) During a later pre-operative exam, the provider noted a "cane assisted moderately antalgic gait favoring the left leg." (Tr. at 3399; see also Tr. at 3106-08, 3067-68, discussing the lipoma excision.)

Plaintiff continued to received chiropractic treatment in late 2022, with the notes again stating she "continues to struggle with pain, discomfort and limitations while at work and performing activities of daily living." (Tr. at 2233, 2236, 2239, 2242, 2245, 2248, 2251, 2254, 2257, 2260, 2263, 2266, 2269.) She also received additional injections from Dr. Gikas, reporting slight improvement. (Tr. at 3981, 3870-71, 3790.)

From October 2022 to February 2023, plaintiff also received PT for neck pain. (Tr. at 3883, 3568.) Initial exam revealed painful ROM at the cervical spine. (Tr. at 3886.) During subsequent sessions plaintiff reported gradual improvement (Tr. at 3816, 3810, 3747, 3686), making ROM gains and noticing carry over of progressions with activities at home (Tr. at 3649). However, she still avoided lifting objects like grocery bags, and overhead tasks remained limited by pain and lack of ROM. (Tr. at 3749.) She discharged due to a new order for PT for headaches, to incorporate dry needling. (Tr. at 3568.)

In November 2022, Dr. Baur prepared a report, listing symptoms of pain and paresthesia, and clinical findings of pain on palpation (neck, back); MRI imaging showing degenerative changes and disc herniation; and right gluteal scarring and necrosis. (Tr. at 2224.) Dr. Baur opined that pain would frequently interfere with plaintiff's attention and concentration (Tr. at 2224); that plaintiff could continuously sit and stand 30 minutes (Tr. at 2224), and in a day stand/walk less than two hours and sit about four hours (Tr. at 2225); that she needed a job that permits shifting positions at will; that she needed unscheduled breaks four to five times per day, lasting 20-30 minutes; that she could frequently lift and carry less

7

than 10 pounds, occasionally 10 pounds, never more; that she could occasionally twist, climb stairs and rotate/turn her head, rarely stoop, crouch and flex/extend her neck, and never climb ladders (Tr. at 2225); and that she could use her hands 33% of the day, never use her fingers, and reach 5% of the day on the right and 1% on the left (Tr at 2226). Finally, she would have good and bad days, and more than four absences per month. (Tr. at 2226.)

In December 2022, plaintiff reported variable response to the injections provided by Dr. Gikas, with some providing 0% relief, others 50% improvement. (Tr. at 3674.) Chiropractic notes from early 2023 again noted she "continues to struggle with pain, discomfort and limitations while at work and performing activities of daily living." (Tr. at 4046, 4048, 4050, 4053, 4057. 4059, 4063, 4065-66, 4069, 4071, 4074-75, 4077.) March 2023 chiropractic notes documented marked deterioration due to an acute flare-up (Tr. at 4080), a comment repeated in subsequent notes (Tr. at 4083, 4086, 4089, 4092, 4096, 4099, 4102, 4105, 4107, 4110, 4114, 4116-17, 4119, 4123, 4125, 4128, 4131, 4135, 4137, 4139, 4140, 4143, 4146, 4149, 4152, 4154, 4157, 4160, 4163, 4167, 4169, 4172, 4175, 4178, 4181, 4183, 4185, 4187, 4191, 4193, 4196, 4199, 4202, 4205, 4208, 4211, 4214). Beginning in April 2024, the chiropractic notes stated she "is of good health and expected to make good progress and recovery with few residuals." (Tr. at 4217, 4220, 4223, 4227, 4230, 4232, 4236.)

Plaintiff also continued to see Dr. Gikas for injections in 2023 (Tr. at 3583-84, 3441, 3443, 3333, 3343), reporting temporary relief of pain (Tr. at 3375). She also underwent an additional course of PT from February to April 2023 for chronic neck pain and headaches (Tr. at 3454, 3306), reporting improvement after dry needling (Tr. at 3365, 3366, 3361). At discharge, plaintiff noted great improvement in cervical range of motion and neck pain, with decreased frequency of headaches and improved tolerance for daily tasks. (Tr. at 3305.) An

8

April 2023 cervical MRI showed mild cervical spondylosis. (Tr. at 3231.) In May 2023, Dr. Swanson hesitated to offer surgery, given the mild findings, instead ordering an EMG of the bilateral upper extremities. (Tr. at 3194.) In April-May 2023, plaintiff received PT for a jaw issue. (Tr. at 3206, 3154.) The June 2023 EMG testing was normal. (Tr. at 3113, 3093.) An August 2023 lumbar MRI showed no significant spinal canal narrowing, improved from the prior MRI, and multi-level degenerative changes. (Tr. at 3035.) An August 2023 EMG of the lower extremities was also normal. (Tr. at 3024.) Dr. Swanson again declined to recommend surgery, making a referral to pain management. (Tr. at 3014.)

Plaintiff subsequently received injections and a course of PT for shoulder pain in 2023. (Tr. at 2947, 2948, 2939.) As with previous treatments, she reported some improvement of pain but with continued intermittent symptoms. (Tr. at 2798, 2788.)

In December 2023, Dr. Swanson recommended yet another course of PT for neck pain. (Tr. at 2730.) During the initial evaluation, plaintiff reported difficulty holding things, especially in her left hand. (Tr. at 2713.) The April 2024 discharge summary indicated she made gains as expected, reaching maximal benefit. (Tr. at 2543, 2545.)

Following a rheumatology consult in March 2024 (Tr. at 2395), Dr. Baur added diagnoses of fibromyalgia and failed low back surgery syndrome to plaintiff's list of impairments. (Tr. at 2573.) Plaintiff was advised to start Celebrex. (Tr. at 2370.) Plaintiff also continued to experience recurrent right buttock pain and swelling (Tr. at 2676), leading to drain placement (Tr. at 2637, 2618, 2586). In April 2024, Dr. Swanson again recommended against surgical intervention for plaintiff's neck pain. (Tr. at 2518.) A May 2024 lumbar MRI was similar to the prior exam. (Tr. at 2475.)

## B.    Procedural History

### 1.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in September 2022, initially claiming a disability onset date of April 28, 2017. (Tr. at 197.) She alleged impairments of the back, neck, jaw, hip, stomach, leg and head, as well as sleep apnea. (Tr. at 222.) In a function report, plaintiff wrote that she could not walk, stand, sit, drive, bend, and lift for long periods. (Tr. at 245.) Her fiancé did the lawn care, cooking, and garbage. Plaintiff reported difficulty with personal care requiring bending. (Tr. at 246.) She sometimes did laundry if feeling OK. (Tr. at 247.) She reported that her impairments affected lifting, walking, stair climbing, squatting, sitting, bending, kneeling, standing, completing tasks, and reaching. She could lift no more than 15 pounds, stand no more than 30 minutes, walk no more than 30 minutes, and sit no more than one hour. (Tr. at 250.) She also reported using a walker and cane. (Tr. at 251.) In a later report, plaintiff indicated she could lift 5-10 pounds, stand 15 minutes to one hour, and sit 30 minutes to two hours. (Tr. at 292.) She again reported using a cane. (Tr. at 293.)

The agency denied the application at the initial level on August 31, 2022 (Tr. at 91) based on the review of Pat Chan, M.D. (Tr. at 64), who found plaintiff capable of light work with no more than frequent overhead reaching (Tr. at 68, 72). Plaintiff requested reconsideration (Tr. at 96), but on June 21, 2023 (Tr. at 99) the agency maintained the denial based on the review of Karen Schnute, M.D. (Tr. at 76), who found plaintiff capable of light work; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; frequently balancing, stooping, kneeling, crouching, or crawling; and frequently reaching overhead (Tr. at 83-84). Plaintiff then requested a hearing before an ALJ. (Tr. at 103.) Prior to the hearing,

10

she amended the alleged disability onset date to July 20, 2020. (Tr. at 334.)

**2. Hearing**

On August 22, 2024, plaintiff appeared with counsel for her hearing before the ALJ. The ALJ also called a vocational expert (VE) to provide testimony on jobs plaintiff might be able to do. (Tr. at 36.)

Plaintiff testified that she stood 5'5'" tall and weighed 260 pounds. (Tr. at 41.) She had a driver's license but limited ability to drive due to discomfort using her right leg to push on the pedals. She testified that she used a cane prior to her back surgery in April 2022. (Tr. at 42.) After the surgery, she stopped relying on the cane until recently, when the pain returned. (Tr. at 42-43.)

Plaintiff testified that she last worked in 2017 as a special education aide. (Tr. at 43-44.) She had not worked since then due to worsening back and neck pain. (Tr. at 44.) She also reported a left shoulder impairment, which caused numbness in her fingers and dropping of objects. (Tr. at 44-45.) She also had a tear in her right hip from a fall down the stairs on July 20, 2020, which caused shooting pain down to her foot. She further reported plantar fasciitis in both feet, fibromylagia, and a variety of other conditions. (Tr. at 45.) For pain she received chiropractic treatment and physical therapy; she did not take medications. She did benefit from the April 2022 back surgery. (Tr. at 46.)

Plaintiff testified that she could stand and walk for 30-40 minutes, sit for 45 minutes to two hours, and lift 5-10 pounds. (Tr. at 48.) She further testified that she could not do much with her left arm and hand due to numbness. (Tr. at 49-50.)

The ALJ then turned to the VE, asking about available work for a person of plaintiff's age, education, and experience, limited to light work, except that she could never climb ladders,

11

ropes, or scaffolds; could occasionally climb ramps or stairs and occasionally stoop, kneel, crouch, crawl, and balance; could frequently reach, handle, and finger with the bilateral upper extremities; could never be exposed to workplace hazards; and could occasionally operate foot controls with the right lower extremity. The VE testified such a person could work as an office mail clerk, warehouse checker, and office helper. (Tr. at 53.) Further limiting the person to sedentary work, with the other limitations, the person could work as a bench assembler, weight tester, and toy stuffer. Adding a limitation to occasional handling, fingering, and reaching with the left arm would eliminate all work at the sedentary level. (Tr. at 54.)

### 3.   ALJ's Decision

On August 29, 2024, the ALJ issued an unfavorable decision. (Tr. at 14.) Following the familiar five-step disability test, the ALJ determined: (1) that plaintiff did not engage in substantial gainful activity between July 20, 2020, the amended alleged onset date, and December 31, 2022, the date last insured; (2) that she had the severe impairments of degenerative disc disease, hip degenerative joint disease, obesity, and fibromyalgia (Tr. at 19); (3) that none of these impairments qualified as conclusively disabling under the regulations (Tr. at 20-22); (4) that plaintiff had no past relevant work (Tr. at 28); and (5) that she could, given her age, education, work experience, and residual functional capacity (RFC), perform jobs existing in significant numbers in the economy, as identified by the VE (Tr. at 29-30).

Pertinent to this appeal, the ALJ found that plaintiff had the RFC to perform light work, except that she could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, crawl, and balance; could frequently reach, handle, and finger with the bilateral upper extremities; and could occasionally operate foot controls with the right lower extremity. (Tr. at 22.) In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical

12

opinion evidence. (Tr. at 23.)

Plaintiff alleged disability because of problems with her back, neck, jaw, hip, knee, stomach, bladder, leg, and head, asserting that these impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. She also asserted a compromised ability to tend to her activities of daily living, such as taking care of her personal care needs, preparing meals, doing housework and/or yardwork, driving without pain, and engaging in social activities. She also related that her conditions had worsened over time. At the hearing, plaintiff testified to difficulty using her right leg to drive and to use of a cane prior to her back surgery in April 2022. She described radiating pain from her lumbar spine. She also testified to chronic pain in her back, legs, feet, and upper extremities. She described trials of physical therapy, chiropractic treatment, and acupuncture, but not utilizing pain medications. Plaintiff estimated that she could stand and walk for no more than 40 minutes without taking a break, and estimated she could lift no more than 5-10 pounds. (Tr. at 23.)

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. In support of this finding, the ALJ first reviewed the treatment records, which documented a fall resulting in increased back pain corresponding to the amended alleged onset date in July 2020. (Tr. at 23.) Nevertheless, despite her reports of increased back pain, imaging from later 2020 and early 2021 showed only minimal or mild abnormalities; exams showed intact strength, normal gait, and intact sensation, findings in direct contrast with allegations that she could not lift or carry more than 10 pounds and required an assistive device for ambulation; and providers recommended conservative measures to treat

13

her pain, e..g., heat packs, physical therapy, and over-the-counter medications. (Tr. at 23-24.) Plaintiff discharged from physical therapy in March 2021 with significant reduction in symptoms. Although she later returned seeking care for back, neck, and shoulder pain, she reported significant improvement with injections. (Tr. at 24.)

In the fall of 2021, plaintiff sought treatment for hip pain, again reporting improvement with an injection and physical therapy. (Tr. at 24-25.) At times, she displayed an antalgic gait and noted discomfort with laying down and sitting up. (Tr. at 25.)

Plaintiff's treatment for hip and back pain continued into 2022, with updated imaging showing more significant abnormalities. She was also noted to use a cane, with a moderately antalgic gait. In April 2022, she underwent back surgery, followed by more therapy. Providers restricted lifting to 20 pounds and endorsed using a cane to walk long distances. She discharged from therapy in August 2022, reporting significant improvement in pain. (Tr. at 25.)

Plaintiff also received chiropractic care, with the provider indicating she had no complicating factors to her pain and was expected to recover/improve at the same rate as an average patient. The ALJ did acknowledge records from 2022 describing ongoing struggles addressing her pain. (Tr. at 25.)

The ALJ further noted the records documenting a BMI of 44, reflective of extreme obesity. (Tr. at 25-26.) Plaintiff reported ongoing widespread pain including in her back, neck, and upper and lower extremities, and further alleged a reduced exertional tolerance. The ALJ found it reasonable to surmise that plaintiff's obesity contributed in part to her symptoms relating to her other conditions. (Tr. at 26.)

Regarding plaintiff's specific allegations, the ALJ concluded:

At the hearing the claimant testified that at all times prior to her surgery she was

14

utilizing an assistive device to ambulate. As noted above physical examination records do not support this assertion. While certainly there are references to an antalgic gait the clinical record fails to describe the use of an assistive device routinely/regularly or even an antalgic or abnormal gait. Rather, the objective record routinely describes normal and independent ambulation as well as normal strength testing. As such, the undersigned rejects the assertion the claimant would have required an assistive device prior to the date last insured.

The undersigned further acknowledges that while the claimant testified to very significant limitations now, the date last insured is remote and the undersigned cannot extrapolate these limitations to the period before the date last insured given the objective evidence during that period, detailed above. While certainly the record shows the claimant has had other complications with pain and may very well be more limited now, the issue before the undersigned Administrative Law Judge begins with the amended alleged onset date and ends at the date last insured. The clinical evidence and other evidence including the claimant's subjective remarks of functioning during the relevant period support her ability to engage in a reduced range of light work, as defined above. Specifically, the record shows the claimant responded well to her treatment modalities and physical examinations fail to support the inability to sustain the limitations identified herein. As such, the undersigned finds since the amended alleged onset date through December 31, 2022, the claimant could perform light exertional work except claimant [can] never climb ladders, ropes, or scaffolds but can occasionally stoop, kneel, crouch, crawl, and balance. Noted above, the claimant reports ongoing back pain radiating into her lower extremities. Though her lower extremity strength is generally measured at full strength. Providing deference to periods of antalgic gait with decreased sensation it is reasonable to limit the claimant to the frequency of postural movements herein. Given her shoulder and neck pain the undersigned finds the claimant can frequently reach, handle, and finger with the bilateral upper extremities. Generally, testing within the record does not support the allegations that the claimant was dropping items or that she had upper extremity neuropathy. As such, she remains capable of frequent reaching, handling, and fingering. Finally, to provide deference to testimony and her allegations within the record and to remain consistent with a preclusion to climbing ladders, ropes, or scaffolds, the claimant can never be exposed to hazards. Similarly, the claimant reports difficult[y] with her lower extremities including decreased sensation on the right. As such, the undersigned finds the claimant could occasionally operate foot controls with the right lower extremity.

(Tr. at 26-27.)

Turning to the medical opinions, the ALJ first considered the November 2022 report from

plaintiff's primary care provider, Dr. Baur, who stated that plaintiff's attention and concentration

15

would frequently be interrupted, that she could sit and stand no more than 30 minutes before needing to change positions, that over the course of an eight-hour workday she could stand or walk less than two hours and sit for about four hours, that she would require the ability to sit and stand at will and would need to take four to five breaks per day for 20-30 minutes, that she could occasionally lift up to 10 pounds and frequently lift/carry less than 10 pounds, and that she could occasionally twist, climb stairs and use her hands but never climb ladders. He further opined that plaintiff could not perform fine manipulations, could grasp and turn objects only a third of the workday, and could only reach 5% of the day with the right upper extremity and nearly unable to on the left. Finally, he stated plaintiff would miss more than four days of work per month. (Tr. at 27.)

The ALJ concluded:

This opinion is only minimally persuasive. While some limitations are supported such as an occasional ability to climb stairs and some limitations in reaching, handling, and fingering, the degree opined by this provider are simply inconsistent with his own physical examination findings and unsupported by other treatment notes including physical therapy notations. Similarly, the opinion is inconsistent with the post-surgical restriction to lifting 20 pounds whereafter she made improvement in functioning and was discharged from physical therapy with significant improvement, as detailed above. The degree of limitation in [sitting], standing, and walking are also unsupported by subjective remarks of functioning, including driving to Arkansas and ascending and descending stairs. The opinion appears to largely rely on the subjective remarks of the claimant rather than the clinical findings of this provider. The physical therapy notations within the record further support more than a rare ability to stoop, crouch/squat, and rotate her neck. As such, while the undersigned finds support for limitations in exertion, postural, and environmental tolerances the degree given by this provider lack consistency with his own clinical findings and support from other treatment providers and the claimant's own subjective reports within the record. Thus, the opinion is regarded as no more than minimally persuasive.

(Tr. at 27.)

The ALJ:

16

also considered the temporary post-surgical restriction to lifting and carrying. Initially, Dr. Swanson opined the claimant could lift no greater than 5 pounds for 2-weeks; eventually he stated she could lift no more than 20 pounds. (Ex. 3F). While the opinion is limited in scope and duration they were well supported by clinical findings and the physical therapy findings from other providers at the time. That said, the undesigned finds that in light of her ongoing reports of back, neck/shoulder pain, and hip pain prior to the date last insured the claimant was reasonably further limited beyond her exertional tolerance. The undersigned also notes that the claimant was only briefly treated by this provider and it is reasonable to note the restrictions were not intended as permanent. Thus, this restriction/opinion is only partially persuasive as it does not fully accommodate the symptoms of the claimant's impairments in terms of her ability to tolerate postural movements and environmental exposures.

(Tr. at 27-28.)

Finally, the ALJ considered the opinions of the agency medical consultants. At the initial review level, the consultant opined that plaintiff could perform light exertion work, with frequent overhead reaching. At the reconsideration level, the consultant concurred that plaintiff could perform light exertional work, with frequent overhead reaching, but further noted that she could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; and frequently balance, stoop, knee, crouch, or crawl. The ALJ concluded that these:

opinions are only partially persuasive, though the reconsideration level is slightly more persuasive than the initial review. Notably, the record does support that during the relevant period the claimant could sustain the lifting, carrying, pushing, pulling, sitting, and standing/walking requirements of light exertional work. However, the undersigned finds the combined effects of her hip, back, neck, and shoulder pain reasonably preclude the ability to climb ladders, ropes, or scaffolds. The claimant could sustain occasional climbing [of] ramps or stairs, stooping, kneeling, crouching, crawling, and balancing. Further, given her reported neck and shoulder pain the claimant can tolerate frequent reaching, handling, and fingering with the bilateral upper extremities. To remain consistent with inability to navigate ladders, ropes, or scaffolds the claimant cannot tolerate hazards. Such a preclusion is also supported by her occasional use of a cane and eliminates environments which could worsen/exacerbate or harm the claimant. In light of her hip pain the claimant is also reasonably limited to occasional operation of foot controls with the right lower extremity. Neither consultant addressed specific limitations caused by her radiating back pain into her right lower extremity. Overall, the undersigned adopts slightly more restrictive

17

limitations to account for subjective complaints and to the extent the combined effects of her conditions including the effect her obesity has on functioning was not fully considered by the consultants. As such, the opinions are no more than partially persuasive with the reconsideration opinion being slightly more persuasive than the initial opinion. (Ex. 2A; 4A).

In sum, the above residual functional capacity assessment in this finding is based on all of the relevant evidence in the case record. The relevant medical evidence and other evidence in the case record only partially support the claimant's statements regarding the alleged intensity, persistence, and limiting effects of symptoms. Accordingly, the undersigned finds that the above residual functional capacity assessment is the most that the claimant could do on a regular and continuing basis despite the claimant's impairment-related limitations.

(Tr. at 28.)

Based on the VE's testimony that a person with this RFC could perform a significant number of jobs, the ALJ found plaintiff not disabled. (Tr. at 30-31.) On June 10, 2025, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. at 1.) This action followed.

## II. DISCUSSION

## A.     Standard of Review

The court will reverse an ALJ's decision if it is the result of an error of law or it is not supported by "substantial evidence," which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Yokosh v. Bisignano, 170 F.4th 631, 637 (7th Cir. 2026). The court may not, under this deferential standard, re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's determination so long as substantial evidence supports it. Lincoln v. Bisignano, 173 F.4th 886, 891 (7th Cir. 2026). However, the court will conduct a critical review of the record because an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the

18

issues. Id. "In other words, the ALJ must provide a logical bridge from the evidence to his conclusion." Id. "That logical bridge can assure a reviewing court that the ALJ considered the important evidence and applied sound reasoning to it." Moy v. Bisignano, 142 F.4th 546, 552 (7th Cir. 2025) (internal quote marks omitted). "A decision that lacks adequate discussion of the issues will be remanded." Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014).

**B.      Plaintiff's Arguments**

**1.      Treating Physician Opinion**

The regulations require an ALJ to consider all of the medical opinions in the case record. 20 C.F.R. § 404.1520c(b). The ALJ need not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion, including those from the claimant's treating providers. Id. § 404.1520c(a). Rather, the ALJ must articulate how "persuasive" he finds the opinions. Id. § 404.1520c(b). The factors of "supportability" and "consistency" are the most important in determining how persuasive an opinion is; therefore, the ALJ must explain how he considered these two factors. Id. § 404.1520c(b)(2). Supportability refers to the objective medical evidence and supporting explanations presented by the medical source, id. § 404.1520c(c)(1), and consistency refers to how consistent the medical opinion is with the evidence from other medical sources and non-medical sources in the record, id. § 404.1520c(c)(2). The ALJ may, but is not required to, explain how he considered the other regulatory factors: the source's relationship with the claimant, the source's specialization, and the source's familiarity with the other evidence in the record or an understanding of the disability program's evidentiary requirements. Id. §§ 404.1520c(b)(2), (c)(3)-(5).

Plaintiff argues that the ALJ erred in evaluating the opinion of her treating physician, Dr.

19

Baur, who recommended significant limitations. (Pl.'s Br. at 5, 6; Tr. at 2225-26.) The ALJ found this opinion only minimally persuasive. While the ALJ agreed the record supported some limitations, the degree of limitation suggested by Dr. Baur was, the ALJ found, inconsistent with his own physical examination findings and unsupported by other treatment notes including physical therapy notations. The opinion was also inconsistent with plaintiff's post-surgical lifting restriction of 20 pounds, after which she made improvement in functioning and was discharged from physical therapy with significant improvement. The degree of limitation in sitting, standing, and walking conflicted with plaintiff's reports of greater functioning, including driving to Arkansas and ascending and descending stairs. The opinion also appeared to largely rely on plaintiff's subjective remarks rather than the clinical findings of the provider. The ALJ concluded that, while the record supported limitations in exertional, postural, and environmental tolerances, the degree of limitation suggested by Dr. Baur was not supported by his own clinical findings and was inconsistent with the notes from other treatment providers and with plaintiff's own subjective reports within the record. (Tr. at 27.)

For several reasons, remand for reconsideration of Dr. Baur's opinion is warranted. First, the ALJ failed to discuss the support provided by Dr. Baur within the report, as § 404.1520c(c)(1) requires. See Bakke v. Kijakazi, 62 F.4th 1061, 1068 (7th Cir. 2023) ("The . . . regulation requires an ALJ, in reaching his conclusions, to consider the internal supportability of a physician's medical opinion."); see also Mandrell v. Kijakazi, 25 F.4th 514, 519 (7th Cir. 2022) ("[A]n ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence.") (cleaned up). Dr. Baur identified clinical findings and objective signs of pain on palpation (neck, back); MRI imaging showing degenerative changes and disc herniation; and right gluteal scarring and necrosis. (Tr. at

20

2224.) The ALJ did not consider whether this evidence supported Dr. Baur's proposed limitations. (Pl.'s Br. at 7-8.)

Second, while the ALJ found Dr. Baur's limitations inconsistent with his own physical examination findings and unsupported by other treatment notes, including physical therapy notations, he failed to offer any further explanation as to why that was so, nor did he cite any specific portion of the record in support of this finding.[5] (Pl.'s Br. at 9-10.) As the Commissioner notes (Def.'s Br. at 5), an ALJ need only minimally articulate his reasons. Crowell v. Kijakazi, 72 F.4th 810, 816 (7th Cir. 2023); see also Warnell v. O'Malley, 97 F.4th 1050, 1053 (7th Cir. 2024) ("An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning."). But in a case like this, with a 4200+ page record, absent some specification a reviewing court cannot "assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." Moore, 743 F.3d at 1121. True, the ALJ summarized the medical record earlier in his decision, and in some situations a court may be able to locate support for an inadequately explained finding elsewhere in the decision. See, e.g., Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015). But in this case it is not obvious from that discussion which

---

[5]As discussed above, plaintiff underwent numerous courses of physical therapy, generally noting some benefit but not to the point where her symptoms resolved. As the Seventh Circuit has noted: "There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce[.]" Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). The Commissioner responds that it is appropriate for an ALJ to consider the trajectory of a claimant's symptoms. (Def.'s Br. at 6, citing SSR 16-3p, 2016 SSR LEXIS 4, at *16 ("Important information about symptoms recorded by medical sources and reported in the medical evidence may include . . . change over a period of time (e.g., whether worsening, improving, or static)[.]".) However, in this case the ALJ cited no specific evidence that plaintiff's improvement increased her ability to perform any activity Dr. Baur believed to be significantly restricted. (Pl.'s Br. at 10.)

21

findings the ALJ found inconsistent with Dr. Baur's report, and when the ALJ did cite the record in that summary he provided exhibit numbers only. For instance, the ALJ repeatedly cited Exhibit 1F (Tr. at 24-25), which alone comprises 1024 pages of the record (Tr. at 341-1364). This practice, while not forbidden, certainly makes "judicial review more difficult." Fuchs v. Astrue, 873 F. Supp. 2d 959, 971 (N.D. Ill. 2012).

Third, the ALJ found that Dr. Baur relied on plaintiff's subjective allegations rather than objective findings, but again he did not explain this finding. (Pl.'s Br. at 12.)The ALJ did not, for instance, cite evidence that Dr. Baur simply repeated plaintiff's statements about what she believed she could do. While an ALJ may discount "the portion of a treating physician's opinion based solely on the claimant's subjective complaints," Karr v. Saul, 989 F.3d 508, 512 (7th Cir. 2021), the ALJ here failed to explain why he believed Dr. Baur based his proposed limitations solely on plaintiff's subjective complaints rather than his own observations and the objective signs. See Reinaas v. Saul, 953 F.3d 461, 466 (7th Cir. 2020) (finding the ALJ erred in determining that a doctor's opinion was based solely on subjective complaints where the treatment notes cataloged some subjective complaints but also showed that the doctor examined the claimant and observed visible muscle spasms, objective signs of persistent nerve damage, and limited neck range of motion before the doctor concluded that the claimant was permanently disabled).

Fourth, the ALJ discounted Dr. Baur's proposed limitations in sitting, standing, and walking as inconsistent with plaintiff's reports of greater functioning, including driving to Arkansas and using the stairs. (Pl.'s Br. at 11-12.) Again, absent some further explanation, it is hard to see how these reports undermine Dr. Baur's opinion. For instance, the ALJ did not cite evidence that plaintiff's trip to Arkansas suggested abilities greater than Dr. Baur found.

22

See <u>Murphy v. Colvin</u>, 759 F.3d 811, 817 (7th Cir. 2014) (remanding where the ALJ relied on the claimant's vacation but failed to explain how this trip was inconsistent with her claimed degree of physical limitation).[6] Nor did the ALJ cite evidence suggesting that plaintiff <u>frequently</u> climbed stairs, such that her report conflicted with Dr. Baur's limitation to occasional climbing. (Pl.'s Br. at 12.)

Finally, the ALJ relied on plaintiff's post-surgical 20-pound lifting restriction, after which she made improvement in PT. As the ALJ himself acknowledged in discussing this opinion, however, that restriction was intended to be temporary after plaintiff's lumbar spinal surgery and did not take into account plaintiff's other impairments. (Tr. at 27-28.) Dr. Baur, on the other hand, did consider the totality of her impairments. (Pl.'s Br. at 10-11.) In sum, the ALJ failed to offer an adequate explanation, supported by substantial evidence, for finding Dr. Baur's opinion only minimally persuasive.

Plaintiff also complains that the ALJ did not address other evidence that could be deemed consistent with Dr. Baur's opinion, e.g., notations of pain with lumbar range of motion,

---

[6]The parties engage in a side debate about whether plaintiff actually drove to Arkansas. As the Commissioner notes, a September 2020 PT note discusses the planned trip, stating that plaintiff "will be doing most of the driving." (Def.'s Br. at 7, citing Tr. at 609.) Plaintiff accuses the Commissioner of a <u>Chenery</u> violation by quoting from a note the ALJ did not specifically cite. See <u>Parker v. Astrue</u>, 597 F.3d 920, 922, 925 (7th Cir. 2010) (explaining that the <u>Chenery</u> doctrine, <u>see</u> <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 87-88 (1943), forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced, and finding a violation where the Commissioner's lawyers cited evidence not mentioned by the ALJ). Plaintiff also contends that no evidence established that she actually completed this trip or that she drove most of the distance, making her statement purely "aspirational." (Pl.'s Rep. Br. at 6.) As indicated above, a PT note from later in September 2020 states: "Patient went to Arkansas last week. She returned Saturday." (Tr. at 599.) While the ALJ did not specifically cite these notes, in this instance review of the record permits me to locate supporting evidence. Nevertheless, as plaintiff notes, the ALJ failed to appreciate that a long drive, unlike the workplace, can be interrupted by an unlimited number of breaks. (Pl.'s Br. at 11-12; Pl.'s Rep. Br. at 6-7.)

painful knee flexion, reduced range of motion of the hips, reduced grip strength, sensory deficits, and treatment including injections and a lumbar discectomy. (Pl.'s Br. at 8-9.) While the ALJ noted some of this evidence in his summary of the medical record, that cannot, plaintiff contends, substitute for meaningful analysis of the evidence. (Pl.'s Br. at 9.)

The Commissioner responds that the ALJ did not whitewash the record. For instance, he acknowledged notes documenting reports of ongoing pain, antalgic gait, and tenderness to palpation. (Def.'s Br. at 6.) To the extent plaintiff is "complaining that the ALJ's summary was a partial summary of select evidence, that is equally unavailing because all summaries must be partial and selective." Gedatus v. Saul, 994 F.3d 893, 901 (7th Cir. 2021) (citing Herrmann v. Cencom Cable Assocs., Inc., 978 F.2d 978, 983 (7th Cir. 1992)).

Plaintiff replies that her complaint is not that the ALJ failed to address every piece of evidence but that he "overlooked entire swaths" of evidence, Reinaas, 953 F.3d at 466, and failed to minimally explain how the evidence he did cite supported his conclusion about Dr. Baur's opinion. (Pl.'s Rep. Br. at 1-2.) She further notes that, while summaries are permissible, they cannot substitute for a meaningful analysis of the evidence. See Olejnik v. Kijakazi, No. 21-C-1478, 2022 U.S. Dist. LEXIS 201146, at *29 (E.D. Wis. Nov. 3, 2022) ("In this case, however, the ALJ noted a number of disparate findings, some supporting plaintiff's claims and some not, citing exhibits covering hundreds of pages in the record (and without identifying specific pages), then asserted a conclusion that Dr. Shopbell's opinions were unpersuasive."); Palacios v. Saul, No. 20-C-384, 2021 U.S. Dist. LEXIS 47769, at * 22 (E.D. Wis. Mar. 15, 2021) ("[M]uch of the ALJ's analysis consists of a summary of the evidence, without an explanation as to how the evidence supported his finding."). The ALJ's summary here offered no indication of how he considered any potentially favorable findings. (Pl.'s Rep. Br. at 4-5.)

24

A claimant insisting on a more fulsome discussion of the record faces an uphill climb before a reviewing court. See Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021) ("[A]n ALJ need not discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability.") (cleaned up). Given the other flaws in the ALJ's analysis noted above, I need not rule on this basis alone. Plaintiff may raise the issue with the ALJ on remand, bringing to his attention all of the evidence she believes supportive of and consistent with Dr. Baur's opinion.

### 2. RFC/Manipulative Limitations

RFC is an assessment of the claimant's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day for five days a week or an equivalent work schedule. SSR 96-8p, 1996 SSR LEXIS 5, at *1. The RFC assessment must be based on all of the relevant evidence in the record, including the treatment notes, medical source statements, reports of daily activities, and lay evidence. Id. at *13-14. The assessment must also include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. at *19; see also Jarnutowski v. Kijakazi, 48 F.4th 769, 774 (7th Cir. 2022) (discussing the accurate and logical bridge requirement in RFC determinations). Finally, the RFC must include all of the claimant's limitations supported by the medical record, Reynolds v. Kijakazi, 25 F.4th 470, 473 (7th Cir. 2022), including manipulative limitations. See Herrmann v. Colvin, 772 F.3d 1110, 1112 (7th Cir. 2014).

Plaintiff argues that the ALJ failed to build an accurate and logical bridge from the evidence to his RFC conclusion that she could frequently reach, handle, and finger. (Pl.'s Br. at 6, 13.) Plaintiff cites her reports of numbness, weakness, and pain, which limited activities

25

such as writing, preparing meals, and washing dishes. (Pl.'s Br. at 13.) The agency medical consultants opined that she could frequently reach overhead, and the ALJ found she could frequently reach, handle, and finger. In support, the ALJ noted that plaintiff reported neck and shoulder pain, but testing did not support allegations that she dropped items or that she had upper extremity neuropathy. (Tr. at 26.) Plaintiff contends that while the ALJ generally cited her reports of neck and shoulder pain to support a limitation to frequent reaching, handling, and fingering, he cited no actual evidence that supported this finding. (Pl.'s Br. at 14.)

Plaintiff overlooks the ALJ's partial reliance on the opinions of the agency consultants, both of whom limited plaintiff to frequent overhead reaching. (Tr. at 28.) Plaintiff's argument also misunderstands the applicable burden. As the Seventh Circuit noted in rejecting a similar argument:

> True, the ALJ did not point to evidence that Vang could perform light work. The ALJ did, however, weigh the evidence and conclude that the record did not support a determination that Vang could not work. Ultimately, it was Vang's burden, not the ALJ's, to prove that he was disabled. Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017). An ALJ adequately supports his RFC determination when he "consider[s] all limitations supported by [the] record evidence" and "tie[s] the record evidence to the limitations included in the RFC finding." See Jozefyk v. Berryhill, 923 F.3d 492, 497-98 (7th Cir. 2019).

Vang v. Saul, 805 Fed. Appx. 398, 401-02 (7th Cir. 2020).

Plaintiff further argues that the ALJ overlooked objective findings suggesting greater limitations, including decreased sensation, diminished range of motion, cervical radiculpathy, and reduced grip strength. (Pl.'s Br. at 14.) While the ALJ noted that "testing" did not indicate she dropped items, or confirm neuropathy, he did not expand on this finding. Nor did he engage with the evidence of reduced grip strength or explain why it did not corroborate her alleged difficulty holding objects. Plaintiff did not attribute her manipulative limitations to

26

neuropathy, so its absence does not support the ALJ's conclusion. Plaintiff stresses that the error was not harmless, as a limitation to occasional handling would preclude all of the jobs identified by the VE. (Pl.'s Br. at 15.)

The Commissioner responds that the ALJ cited additional evidence in support of this conclusion, e.g., the recommendation for conservative treatment measures, findings of normal range of motion of the neck, 5/5 strength in the extremities, and chiropractic records indicating she was expected to recover/improve. (Def.'s Br. at 7.) The Commissioner further argues the ALJ provided a sufficient explanation for his finding. (Def.'s Br. at 7-8.) Finally, the Commissioner defends the ALJ's discussion of neuropathy, as that condition causes many of the symptoms plaintiff reported. (Def.'s Br. at 8.)

As plaintiff notes in reply, however, it is unclear how any of the evidence contained in the ALJ's earlier summary related to or supported the ALJ's finding of a "frequent" rather than "occasional" manipulative limitation. (Pl.'s Rep. Br. at 7-8.) For instance, regarding the chiropractic records, the ALJ cited Exhibit 2F for the proposition that plaintiff "had no complicating factors to her pain and was expected to recover/improve at the same rate as an average patient with an uncomplicated case." (Tr. at 25.) This exhibit covers the period of January 2019 to May 2022 and consists of 214 pages. (Tr. at 1365-1578.) These notes document an identical "assessment", both before and after the alleged onset date:

> KRISTIN is of good health and is expected to make good progress and recovery with few residuals. She has no complicating factors and no noted contraindications to chiropractic care. Based on her history and examination, it is reasonable to believe that her recovery may take about the same length of time as an average patient with an uncomplicated case.

(E.g., Tr. at 1368, 1/9/2019 note; 1370, 1/25/2019 note; 1372, 2/6/2019 note; 1473, 11/5/2020 note; 1476, 11/19/2020 note; 1479, 12/3/2020 note; 1539, 10/21/2021 note.) The "assessment"

27

changed as of 11/4/2021: "KRISTIN continues to struggle with pain, discomfort and limitations while at work and performing activities of daily living." (Tr. at 1543.) The chiropractic notes from September 2022 to December 2022 (contained in Exhibit 7F) repeat the more pessimistic "assessment": "KRISTIN continues to struggle with pain, discomfort and limitations while at work and performing activities of daily living." (E.g., Tr. at 2233, 2266, 2269.) The ALJ acknowledged that notes from 2022 describe ongoing struggles addressing pain (Tr. at 25, citing Ex. 2F, 7F), but he gave no indication as to why one of these two "assessments" was more persuasive than the other in addressing manipulative limitations or any other aspect of RFC. Further, while the record does contain evidence ruling out neuropathy (Tr. at 1719), this does not discount the other impairments documented in the record as a cause for plaintiff's alleged manipulative limitations. Finally, Dr. Baur recommended significant manipulative limitations, and for the reasons set forth above the matter must be remanded for reconsideration of his opinion. The ALJ must also on remand reconsider plaintiff's manipulative limitations as part of the RFC analysis.

### 3. Subjective Allegations

In determining whether a claimant is disabled, the ALJ must consider all symptoms, including pain, and the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function.

28

Id. at *9.

At the second step, the ALJ may not discount a claimant's subjective complaints simply because her statements are not supported by objective medical evidence. Id. at *9-10. Rather, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record considering, in addition to the objective medical evidence, id. at *11, the claimant's daily activities; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the claimant receives or has received for relief of the symptoms; and any measures other than treatment the claimant uses or has used to relieve the symptoms. Id. at *18-19.

"The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. So long as the ALJ gives specific reasons supported by the record, the court will overturn his credibility determination only if it is "patently wrong." Pufahl v. Bisignano, 142 F.4th 446, 458 (7th Cir. 2025).

Plaintiff argues that the ALJ erred in discounting her subjective allegations here. (Pl.'s Br. at 6, 16.) The ALJ concluded that much of plaintiff's testimony pertained to her current condition, rather than her condition during the period under review. (Tr. at 26.) Plaintiff complains that the ALJ did not direct her to focus her testimony on the 2020-2022 time period, instead asking her about the issues she had been dealing with "since 2020." (Tr. at 44.) He did not instruct her to limit her testimony to why she believed she could not work prior to 2022. (Pl.'s Br. at 16.) Indeed, at one point he specifically asked about her "biggest limiting factor right

29

now." (Tr. at 46, emphasis added.) Plaintiff contends that she could not have anticipated the ALJ would disregard her testimony as unrelated to the period at issue when he never told her to restrict her answers to that period. She contends remand is required so the ALJ can properly develop the record for the period at issue. (Pl.'s Br. at 17.)

The Commissioner responds that plaintiff reads too much into the ALJ's statement, which simply affirmed that plaintiff's testimony about her current state could not be extended back in time. The ALJ never said that plaintiff testified only as to her current condition, and the transcript includes specific references to the 2020-2022 period. (Def.'s Br. at 8-9.) As plaintiff notes in reply, however, the ALJ made no distinction between her statements about symptoms pre- and post-dated last insured. (Pl.'s Rep. Br. at 9-10.) I agree with plaintiff that if the ALJ was going to draw this distinction he should have focused his questioning at the hearing. See Fox v. Berryhill, No. 17-CV-635, 2018 U.S. Dist. LEXIS 146162, at *17 (E.D. Wis. Aug. 28, 2018) ("Plaintiff's testimony, and that of his mother, discussed his most recent medical treatments and how his conditions affected his daily life. The ALJ did not attempt to shift their focus to the relevant period, but instead posed questions in the present tense.").

Plaintiff further argues that the ALJ failed to articulate if or how he considered her activities of daily living. Plaintiff reported that her symptoms interfered with a variety of activities, including shopping, eating, cooking, dishes, laundry, and self-care. (Pl.'s Br. at 17.) While the ALJ summarized some of her activities, he never discussed how they factored into his symptom analysis. (Pl.'s Br. at 17-18.)

The Commissioner responds that the ALJ took note of plaintiff's compromised ability to tend to her activities of daily living. (Def.'s Br. at 9, citing Tr. at 23.) At least in cases where the ALJ does not make an adverse finding based on such activities, further analysis is not required.

30

See Ducharme v. Kijakazi, No. 21-2204, 2022 U.S. App. LEXIS 22297, at *9 (7th Cir. Aug. 11, 2022) ("[T]he ALJ did not even make an adverse finding based on these activities, let alone deny him disability benefits for that reason. The ALJ simply described these activities in its subjective symptom analysis, which is exactly what ALJs are supposed to do.").

Plaintiff replies that, if the ALJ provides other reasons for his credibility finding, it may be permissible to simply note the claimant's activities without further analysis. (Pl.'s Rep. Br. at 10.) In this case, however, the ALJ failed to otherwise provide a sufficient analysis, leaving the court to guess as to his path of reasoning. (Pl.'s Rep. Br. at 10-11.)

Looking to the other reasons the ALJ provided reveals many of the same problems noted above. The ALJ mentioned the "clinical evidence" and plaintiff's "subjective remarks of functioning" during the relevant period (Tr. at 26), but he did not specify the evidence he found significant, and absent further explanation plaintiff's trip to Arkansas and periodic use of stairs rather than an elevator cannot support an adverse credibility finding. The ALJ also noted that plaintiff "responded well to her treatment modalities" and "physical examinations fail to support the inability to sustain the limitations identified herein." As discussed above, however, while plaintiff at times reported benefit from treatment, her symptoms always seemed to return. As also discussed above, it is unclear which physical exams the ALJ found significant. Nor, as also indicated above, did the ALJ explain which "testing" discounted plaintiff's testimony about dropping items. (Tr. at 26.)

Although the court affords an ALJ's credibility finding considerable deference and will overturn it only if patently wrong, the ALJ must justify the finding with specific reasons supported by the record. Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009). Because the ALJ did not do so here, the matter must also be remanded for reconsideration of plaintiff's

31

statements regarding her symptoms.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 29th day of May, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

32